**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**William Alexander Parks**

    v.                                                               **Civil No. 04-CV-445-PB**

**Carol Ann Tatarinowicz, et al.**

**MEMORANDUM AND ORDER**

This civil action arises from plaintiff William Parks's strained relationship with his ex-girlfriend, Carol Tatarinowicz, and from a series of encounters Parks had with the officers of several Seacoast region police departments. Parks sued a laundry list of defendants in Rockingham County Superior Court, including Tatarinowicz, the Town of Seabrook and Seabrook police officers Michael Gallagher and Scott Mendes ("Seabrook defendants"), the Town of Kensington and Kensington police officer Brian Rathman ("Kensington defendants"), the Town of Hampton Falls, Hampton Falls police chief Robbie Dirsa and Hampton Falls police officers Marshall Bennett and Joy LePage ("Hampton Falls defendants"), as well as Ottoway Newspapers and its publisher John Tabor. He

seeks damages, referrals to the appropriate prosecuting authority for criminal prosecutions, expungement of his criminal record, and return of/compensation for certain property.

Defendants removed the case from superior court on November 24, 2004. The Seabrook, Kensington, and Hampton Falls defendants have subsequently moved for summary judgment (Docs. No. 63, 31, and 92).[1]

For the reasons set forth below, I grant the defendants' motions as to Parks's federal constitutional claims and remand the case to Rockingham County Superior Court for adjudication of the remaining claims, over which I decline to exercise supplemental jurisdiction.

## I. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

---

[1] Summary judgment motions have also been filed by Tatarinowicz (Doc. No. 64) and Ottoway and Tabor (Doc. No. 80). Parks has not asserted federal claims against these defendants and I do not address their motions here.

is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, I construe the evidence in the light most favorable to the nonmovant.  Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

The party moving for summary judgment "bears the initial responsibility of . . . identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the burden shifts to the adverse party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted."  Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996).

The "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).[2]

---

[2] Parks claims that his complaint and pleadings are verified complaints.  Pl.'s Mot. for Assignment of Counsel at 3.

Further, Local Rule 7.2(b)(2) dictates that "[a]ll properly supported material facts set forth in the moving party's factual statement shall be deemed admitted unless properly opposed by the adverse party." See also Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 102 (1st Cir. 2003) (applying Massachusetts Local Rule 56.1, which is substantially similar to Rule 7.2(b)(2)). Evidence that is "merely colorable or is not significantly probative" is insufficient to defeat summary judgment. Anderson, 477 U.S. at 249 (citations omitted).

This standard of review influences my recitation of the

---

A party may set forth specific triable facts in a verified complaint rather than an affidavit "to the extent that [the verified complaint] satisfies the standards explicated in Rule 56(e)." Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir. 1991). Cf. Felix v. Lugas, No. 00-12225-DPW, 2004 U.S. Dist. LEXIS 15520 at *6 n.5 (D. Mass. March 2, 2004) (unverified complaint, "is not the equivalent of an affidavit and therefore does not form part of the summary judgment record"). A verified complaint must comply with 28 U.S.C. § 1746, see Williams v. Browman, 981 F.2d 901, 904 (6th Cir. 1992), which requires that a party sign a statement "in substantially the following form: . . . . 'I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.'" 28 U.S.C. § 1746. As neither Parks's complaint nor his pleadings contain such language, I may not treat them as affidavits for summary judgment purposes. Cf. Nowaczyk v. Warden, No. 97-309-JD, 2003 U.S. Dist. LEXIS 6912 at *3 n.1 (D.N.H. April 24, 2003) (where plaintiff signed a petition pursuant to § 1746, the factual allegations contained therein could be considered).

-4-

facts set forth below.  While I adhere to the principle that I must view the facts in the light most favorable to the adverse party, I accept as true any facts described in defendants' affidavits that Parks has failed to properly challenge.

## II. FACTUAL BACKGROUND

Parks met Tatarinowicz on October 25, 2002.  Rockingham Cty. Writ ("Compl.") at 15.  The pair began a romantic relationship, and Tatarinowicz invited Parks to move into her home after three weeks of dating.  Id. at 16.

### A. June 2003 Incident

On June 15, 2003[3], Hampton Falls defendant Bennett was on patrol when he received a "be on the lookout" ("BOLO") for a blue Ford with Florida license plates.  The car was wanted by the Newbury, Massachusetts police department in connection with a police impersonation incident.  Bennett Aff. at 1-2.  Bennett had previously seen a car that matched the BOLO description turn into Tatarinowicz's driveway.  Id. at 2.  He drove to Tatarinowicz's

---

[3] The dates in Parks's writ conflict with those reported in the police officers' affidavits, which I regard as accurate and use here.  The exact dates are not determinative.

neighborhood and confirmed that a car parked there had the same license plate number as the car described in the BOLO. Id. Bennett met three state police troopers and a detective from the Newbury police department at the Hampton Falls police station, and the group went to Tatarinowicz's home to investigate. Id. at 3; Compl. at 20. Tatarinowicz greeted the officers and led Bennett and the Newbury detective behind the house to find Parks. Parks emerged from the garage and met the state troopers. Bennett Aff. at 3. He gave his written consent to a search of the car, which turned up police equipment including a rotating light and a handheld radar gun.[4] Id. at 3-4. Nevertheless, the officers determined that Parks had not been involved in the Newbury incident and left. Id. at 4. Parks claims that the police officers' actions "violated [his] U.S. Constitutional 4th amendment protections prohibiting unreasonable searches and seizures, [and] violated [his] 5th amendment due process protections; the Miranda Doctrine." Compl. at 20.

---

[4] Parks denies that he consented to the search of his vehicle. Pl.'s Mem. in Opp. to Hampton Falls Defs.' Mot. for Summ. J. at 16. This general denial, in an unsworn pleading, is insufficient to give rise to a genuine factual dispute. In any event, the dispute is immaterial because Parks does not challenge the vehicle search.

**B.   July 2003 Incident**

On July 10, 2003, Tatarinowicz called 911 from her home but apparently hung up before making a request for assistance. Compl. at 6. The 911 dispatch center returned the call and Tatarinowicz stated that she had mis-dialed the number. Id. Hampton Falls defendant LePage was dispatched to Tatarinowicz's home to investigate. LePage Aff. at 1. LePage requested backup from the Kensington police department, which sent an officer to assist her.[5] Id. at 1-2. When LePage arrived at the Tatarinowicz home, Parks met her in the driveway and began yelling that he and Tatarinowicz had been fighting "but that nothing happened and it was over now." Id. at 2. LePage asked Parks to wait by his car while she spoke to Tatarinowicz. Parks "flashed a badge" and shouted that he would stay by his car because he was a cop. Id. While LePage was inside speaking with Tatarinowicz, she noticed that the Kensington officer had

---

[5] LePage identifies the Kensington police officer as "Officer Doyle." LePage Aff. at 2. Doyle is not a defendant, and although Parks states that a second officer assisted LePage, he does not name him. He does claim that the "Town of Seabrook" and "the Rockingham County Sheriff Department" (which is also not a defendant) responded to the 911 call. Compl. at 6. My analysis of the incident in no way depends on the identity of the assisting officer.

arrived.  She radioed to him and asked him to stay at the end of
the driveway to avoid agitating Parks.  Id. at 2-3.  When Parks
continued to yell loudly and angrily after the arrival of the
Kensington officer, LePage went outside.  She saw the Kensington
officer handcuffing Parks, reportedly because Parks had "[become]
enraged and charged at" the officer after being instructed to
stay outside the house.[6]  Id. at 3.  LePage took Parks to her
cruiser; "[h]e screamed that he wanted to be charged with
something."  Id.  LePage attempted to explain to Parks that he
was not being arrested, but rather "detained for safety reasons"
until the end of the investigation into the 911 call.  Id.  Parks
was held in the back of LePage's cruiser for nearly an hour until
LePage finished speaking with Tatarinowicz.  Compl. at 6.  Parks
claims his detention was "in violation of and depriv[ed] [him] of
his Fifth (5th) amendment due process rights as contained in the
U.S. Constitution."  Id.

---

[6]  Parks claims that he "showed no hostile [or] aggressive
behavior" when the officers arrived at Tatarinowicz's home,
Compl. at 6, and denies that he yelled, screamed, or admitted to
having had a fight with Tatarinowicz.  Pl.'s Memo. in Opp. of
Hampton Falls Defs.' Mot. for Summ. J. at 18.  These statements
are unsworn general denials of the officers' statements rather
than specific factual allegations, and as such they are
insufficient to create a genuine issue of material fact.

**C.   September 2003 Incident**

On September 27, 2003, Tatarinowicz obtained an emergency restraining order against Parks.  Id. at 2; LePage Aff. at 4.  On September 28, 2003, Hampton Falls defendant LePage learned that Parks had returned to Tatarinowicz's home in violation of the order.  She initiated a BOLO for his vehicle so that he could be stopped and served with the restraining order.  LePage Aff. at 5. Kensington defendant Rathman was traveling through Seabrook on Route 95 when he heard the BOLO.  Rathman Aff. at 2-3.  He exited the highway and promptly spotted a car meeting the BOLO description.  Id. at 3.  Rathman contacted the Seabrook police department, which authorized him to stop the car.  Id. Subsequently, Seabrook defendants Gallagher and LePage arrived on the scene.  Id. at 4; LePage Aff. at 6. LePage served Parks with the restraining order.  LePage Aff. at 6.

When Rathman asked Parks for identification, Parks responded by showing a badge and saying, "'There, how's that for an ID.'"  Rathman Aff. at 4.  Rathman reported this to Gallagher when Gallagher arrived.  Id. at 4-5.  Eventually, Parks told the

-9-

officers that he was retired.⁷ Gallagher Aff. at 3. However, neither the badge nor an identification card that Parks showed said "retired." Id. Gallagher called the Connecticut State Police and could not confirm that Parks was a former law enforcement officer of any kind. Id. at 3-4. Gallagher also observed two police lights in the back seat of Parks's car, a red light with the word "Police" on it and a blue light with the words "State Police" on it. Id. at 4. According to Parks, the officers "detained [him] for almost an hour while figuring out what to charge him with, and finally, unlawfully charged and arrested [him] for impersonating a police officer." Compl. at 14.

On September 29, 2003, Parks was charged with false personation in Hampton District Court.⁸ See Ex. D to Seabrook

---

⁷ Parks originally claimed that upon being stopped, he told Rathman that he was "a *former* Deputy Sheriff in New London County, Connecticut . . . and a *former* officer with the State of Connecticut, Department of Correction." Compl. at 5 (emphasis added). However, he does not contest the officers' description of the encounter in his most recent pleadings. Instead, Parks comments that the officers "sure can recall all the . . . minute details of what I said and how I said it." Pl.'s Mem. in Opp. to Kensington Defs.' Mot. for Summ. J. at 26.

⁸ Under New Hampshire's false personation statute, it is a misdemeanor when a person "not being a sheriff, deputy sheriff,

Defs.' Mot. for Summ. J. The complaint alleged that Parks, "while not being a New London County Connecticut deputy sheriff or a State of Connecticut Department of Corrections officer, purposely pretend[ed] to be [such an officer] by presenting a New London County Connecticut deputy sheriffs [sic] badge and a Connecticut Department of Corrections identification card to Sergeant Gallagher as a form of identification." Id. On October 29, 2003, Parks pleaded guilty to the charge and on December 18, 2003, the Hampton District Court entered a finding of guilty. Id.

## IV. ANALYSIS

### A. June 2003 Incident

Parks alleges that Hampton Falls defendant Bennett violated Parks's Fourth Amendment right to be free of unreasonable searches and seizures and his Fifth Amendment rights to due process and to Miranda warnings during Bennett's investigation

---

state police officer, police officer of any city or town, or any other law enforcement officer or investigator . . . purposely pretends to be or assumes to act as such law enforcement officer or investigator." N.H. Rev. Stat. Ann. § 104:28-a.

into the Newbury BOLO. Compl. at 20.

Although Parks baldly asserts that the defendant and others "raid[ed]" his residence, Compl. at 20, there is no evidence that police officers entered his home. Id.; see Bennett Aff. at 3-4. Tatarinowicz was at home at the time of the incident, and she met the officers in the driveway and "led [them] around back to find" Parks. Bennett Aff. at 3. "[T]here is no expectation of privacy in a driveway that is exposed to the public," U.S. v. Roccio, 981 F.2d 587, 591 (1st Cir. 1992), so Parks's Fourth Amendment rights were not violated when Bennett observed Parks's license plate. Even if Parks did have an expectation of privacy "around back," Tatarinowicz consented to the officers' presence there. See United States v. Meada, 408 F.3d 14, 21 (1st Cir. 2005) (where police obtain consent from the property owner, a warrantless search does not violate the Fourth Amendment). The officers searched Parks's vehicle, but Parks has not challenged that search, presumably because he consented to the search in writing. Bennett Aff. at 3.[9] Parks has failed to explain how the police

---

[9] Apparently this written consent form is in the possession of the Newbury police department. Bennett Aff. at 3; Dirsa Aff. at 2.

officers' conduct, which comported with the Fourth Amendment, violated his right to due process under the Fifth Amendment.

Nor has Parks shown that he should have been given <u>Miranda</u> warnings. The protections of <u>Miranda</u> do not apply unless a person is in custody. <u>Miranda v. Arizona</u>, 384 U.S. 436, 467 (1966); <u>Pasdon v. City of Peabody</u>, 417 F.3d 225, 227 (1st Cir. 2005). Parks's freedom of movement was not restricted in any way during this incident, so he was not in custody and therefore was not entitled to <u>Miranda</u> warnings.

Accordingly, defendants' motion for summary judgment as to this claim is granted.

## B.  July 10, 2003 Incident

Parks claims that his detention in the Hampton Falls' police cruiser following the 911 call violated his Fifth Amendment right to due process. It appears that Parks means to invoke his Fourth Amendment right to be free of unreasonable seizures. He has not, however, provided any evidence to support such a claim.

Under the rubric of <u>Terry v. Ohio</u>, 392 U.S. 1, 27 (1968), the police "may make brief investigative stops" in certain circumstances. <u>Flowers v. Fiore</u>, 359 F.3d 24, 29 (1st Cir. 2004). "In determining whether a challenged action is

-13-

reasonable, and, thus, falls within the range of permissible investigatory stops or detentions, a court should engage [in] a two-step inquiry, asking (1) whether the officer's action was justified at its inception; and (2) whether the action taken was reasonably related in scope to the circumstances justifying the interference in the first place." U.S. v. McCarthy, 77 F.3d 522, 530 (1st Cir. 1996). I discuss each step in turn.

   1.   Justification for the Stop

A Terry stop is appropriate where there is reasonable suspicion that an individual has committed a crime. Flowers, 359 F.3d at 29. Here, the police officers had ample reason to believe that Parks had committed a crime. They were responding to a late-night 911 hang-up that had been made from Tatarinowicz's home. LePage found Parks outside the home. He appeared to be in an agitated state and eventually charged at the Kensington officer. These circumstances gave rise to reasonable suspicion that Parks had committed a crime, such as threatening Tatarinowicz. See, e.g., U.S. v. Romain, 393 F.3d 63, 72 (1st Cir. 2004), cert. denied, 125 S. Ct. 2924 (2005) (after receiving a 911 call reporting that there was an armed man in a residence, police had reasonable suspicion to conduct a Terry stop in part

because of the suspect's belligerent behavior when the police arrived); U.S. v. Diaz-Juarez, 299 F.3d 1138, 1142 (9th Cir. 2002) (late hour relevant to determination of reasonable suspicion); Gainor v. Douglas Cty., 59 F. Supp. 2d 1259, 1275-76 (N.D. Ga. 1998) (angry and hostile behavior relevant to a determination of reasonable suspicion).

2. Scope of the Stop

"Whether a Terry stop remained related in scope to the circumstances justifying the interference is measured by an objective reasonableness standard." U.S. v. Moore, 235 F.3d 700, 703 (1st Cir. 2000). Courts are required to examine the circumstances of the stop, and balance governmental interests with the intrusion on the individual. Id. In this case, the interference with Parks's liberty was objectively reasonable and did not escalate into a de facto arrest, for which probable cause would have been required.

A Terry stop becomes a de facto arrest when a reasonable person in the suspect's position would have believed himself to be under arrest. Flowers, 359 F.3d at 29. The manner in which the police carried out this stop demonstrates that a reasonable person would not have believed himself to be under arrest.

First, LePage *told* Parks that he was not under arrest, LePage Aff. at 3, and the officers did not treat him as if he had been arrested. The officers did not interrogate Parks. They did not take him anywhere in the police cruiser. Although Parks claims he was "in agony, pain, and in sweltering heat" while he was in the cruiser, Compl. at 6, he has not pointed to any specific mistreatment by the police. In fact, it is evident that Parks had no interaction with the police while he was in the cruiser.

Second, the duration of the stop was reasonable. Although Parks was held for close to an hour, there is "'no rigid time limitation on Terry stops.'" U.S. v. Quinn, 815 F.2d 153, 159 (1st Cir. 1987) (quoting U.S. v. Sharpe, 470 U.S. 675, 685 (1985)); see also McCarthy, 77 F.3d at 531 (upholding 75-minute stop). Instead, courts must examine "whether the police 'diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [suspect].'" Flowers, 359 F.3d at 30-31, (quoting Sharpe, 470 U.S. at 686). In this case, Parks was held until LePage finished her conversation with Tatarinowicz. There is no suggestion that this conversation was

-16-

unduly lengthy.  See McCarthy, 77 F.3d at 531 (finding a stop reasonable where "there [was] no evidence or even an allegation of less than diligent behavior on the part of the police").

Finally, the fact that the officers handcuffed Parks during the stop is not determinative.  Use of restraints does not "automatically convert the encounter into a de facto arrest." U.S. v. Acosta-Colon, 157 F.3d 9, 18 (1st Cir. 1998).  Officers "acting on less than probable cause" should not "handcuff suspects as a matter of routine."  Id.  However, the use of handcuffs is appropriate if officers reasonably believe that handcuffs are necessary to protect the officers, the public, or the suspect during the stop.  Id. at 19.  When the police arrived at Tatarinowicz's residence, Parks was in an enraged state and behaved aggressively toward the officers.  It was reasonable for the officers to believe that handcuffs were necessary to preserve Parks's safety and their own.

In light of Parks' hostile behavior and the officers' need to complete their investigation and protect themselves, the scope of this Terry stop was objectively reasonable.  Accordingly, I grant defendants' motion for summary judgment as to this claim.

## C. September 28, 2003 Incident

Parks's final constitutional claim is that he was unlawfully arrested and charged with impersonating a police officer after being pulled over for service of the restraining order.[10] Parks raises this claim despite his guilty plea in Hampton District Court.

I reject Parks's claim because the police officers had probable cause to arrest Parks for false personation. The false personation statute makes it a misdemeanor to pretend to be a law enforcement officer. N.H. Rev. Stat. Ann. § 104:28-a. Parks answered Rathman's request for identification by presenting a badge that said nothing about retired status. He had two police light bars in the back seat of his car. Gallagher could not confirm that Parks had ever been employed by a law enforcement agency. These facts plainly gave the police probable cause to believe that Parks had violated the false personation statute. Accordingly, his arrest was valid.

For these reasons, the defendants' motion for summary judgment as to this claim is granted.

---

[10] Parks challenges the service of the restraining order itself on state statutory grounds. Compl. at 14.

## V. CONCLUSION

For the reasons set forth above, defendants' motions for summary judgment (Docs. No. 63, 31, and 92) are granted as to Parks's federal constitutional claims against the Hampton Falls, Seabrook, and Kensington defendants based on the events of June 15, July 10, and September 28, 2003. Judgment shall be entered for the defendants on these claims. I decline to exercise supplemental jurisdiction over Parks's state law claims. Therefore, the remaining claims are remanded to Rockingham County Superior Court.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

Date  November 4, 2006

cc: William A. Parks, Esq.
    Donald E. Gardner, Esq.
    Lawrence Gormley, Esq.
    Daniel J. Mullen, Esq.
    Kenneth Murphy, Esq.
    William Scott, Esq.
    **Garry Lane, Esq.**